IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| THE CHAMBERLAIN GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 16 CV 06113 |
| | ) | |
| TECHTRONIC INDUSTRIES NORTH AMERICA, INC., TECHTRONIC INDUSTRIES CO. LTD., ONE WORLD TECHNOLOGIES INC., OWT INDUSTRIES, INC.,ET TECHNOLOGY (WUXI) CO. LTD., RYOBI TECHNOLOGIES, INC., ROYAL APPLIANCE MFG. CO. D/B/A TTI FLOOR CARE N.A., AND GARY SCOTT, | ) ) ) ) ) ) ) ) ) ) ) | Judge John J. Tharp, Jr. |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case thrusts us into the high stakes and high tech world of . . . garage door openers? The Chamberlain Group, a leading manufacturer of "GDOs," has sued Gary Scott, formerly President of its Americas division, and a variety of affiliated corporate defendants, including Scott's new employer, for theft of trade secrets and breach of several employment contracts. The complaint alleges that with Scott's improper assistance, the defendants developed a competing garage door opener. All the defendants except one have moved to dismiss.[1] As the complaint engages in impermissible group pleading as to all of the corporate defendants, the complaint is dismissed in its entirety, but without prejudice, as to them. Some of the claims against Scott individually are adequately pled, some are not, and so as to Scott the motion to dismiss is granted in part but without prejudice, and denied in part.

---

[1] It does not appear Et Technology (WuXi) Co. Ltd. has ever been served and it has not responded to the complaint in any way.

## BACKGROUND

For the purposes of this motion, the Court accepts as true all well-pleaded factual allegations and draws all inferences in favor of the plaintiff, The Chamberlain Group ("Chamberlain"). *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Chamberlain is the world's largest manufacturer of residential and commercial garage door openers. Compl. ¶ 1, ECF No. 1. Defendant Gary Scott served as President of Chamberlain's Americas division from July 2012 to October 2014. *Id.* at ¶ 2. According to the complaint, after working at Chamberlain for about a year, Scott interviewed for a position at "TTI." *Id.* at ¶ 3. No single defendant is identified as "TTI"; rather, beginning with the introduction, the complaint refers to all the defendants other than Scott "collectively" as "TTI" and rarely distinguishes between the seven defendant companies thereafter. For the purposes of providing the background to the 12(b)(6) motion, the Court can do nothing but parrot the complaint's use of "TTI," even though it is not clear to which entities this designation refers, as will be discussed later.

When he was hired, Scott signed a variety of agreements with Chamberlain, including a Non-Competition and Non-Solicitation Agreement. Compl. ¶ 35 and Ex. A. Scott agreed, if he left the company, not to solicit any Chamberlain employees for a year and not to work for any entity that competes with Chamberlain for a year. *Id.* at ¶ 36-37. The Agreement specifically stated that a breach would "subject the Company to a genuine risk of incurring irreparable harm and injury." *Id.* at ¶ 38. Scott also signed an intellectual property confidentiality agreement that applied both during and after his employment. *Id.* at ¶ 40 & Ex. B.

When he entered into discussions with TTI, Scott knew that TTI had been trying to enter the garage door opener market but had thus far been unsuccessful. Compl. ¶ 3. Before starting at Chamberlain, Scott had "long-standing relationships with at least two high-level TTI

executives." *Id*. at ¶ 44. TTI reached out to Scott about potential employment opportunities in July 2013. *Id*. at ¶ 46. At that time, Scott was aware TTI was seeking confidential information about the garage door opener market. *Id*. at ¶ 47. Scott interviewed for a position with TTI in November 2013. *Id*. at ¶ 48. Scott did not join TTI in 2013, but he stayed in touch, sending hardware for a garage door opener to a TTI executive in December 2013. *Id*. at ¶ 49.

In March 2014, Scott requested to visit Chamberlain's suppliers and provided information about his trip to TTI a few days later. Compl. ¶ 49. In mid-September 2014, according to the complaint, Scott met with TTI and provided a "confidential [Chamberlain] document related to [Chamberlain's] customer strategy." *Id*. at ¶ 50. A few days later, Scott "misappropriated a highly confidential summary of [Chamberlain's] sales, profits, and other financial data, including financial data" about the garage door opener market. *Id*. In late September 2014, Scott informed Chamberlain that he would be leaving on October 10, 2014 to take a position with TTI. *Id*. at ¶ 51. Scott said he would be working in TTI's Floor Care subsidiary and did not inform Chamberlain that TTI was interested in entering the garage door opener business. *Id*.

According to the complaint, before he resigned, Scott took (and did not return after he left) "highly confidential data," about Chamberlain's "financial data, customer research and data, and future plans" for garage door openers. Compl. ¶ 52. A few months after he resigned, Scott contacted Chamberlain employees about joining him at TTI. *Id*. at ¶ 56. Less than six months after Scott resigned, Chamberlain's director of marketing communications, who led a unit that developed future products, joined Scott at TTI. *Id*. at ¶ 57. Approximately a year after Scott left Chamberlain, another Chamberlain employee who had worked in marketing communications left for TTI following a solicitation by Scott. *Id*. at ¶ 58.

Chamberlain learned in February 2016 that TTI was planning to release its first garage door opener. Compl. ¶ 59. According to the complaint, this product directly competes with Chamberlain's products and it was "immediately clear" that Scott's knowledge was "highly relevant" to TTI's new line of business. *Id.* In April 2016, TTI launched its new GDO product and it is "substantially similar in several material respects to proprietary and confidential designs that were conceived, researched, and developed" by Chamberlain. *Id.* at ¶ 60. According to the complaint, Scott worked on the garage door opener product at TTI within 12 months of his resignation from Chamberlain. *Id.* at ¶ 62. The complaint alleges TTI was aware of the various employment agreements between Chamberlain and Scott, and that TTI "induced and encouraged" Scott to violate those agreements. *Id.* at ¶ 63. Chamberlain filed this suit on June 10, 2016, asserting claims under various federal and state laws. All the defendants who have appeared in this action have moved to dismiss.

## DISCUSSION

The defendants' arguments can be grouped into roughly three buckets: that the complaint engages in group pleading in violation of Rule 8, that the complaint alleges insufficiently detailed facts, and that there is no personal jurisdiction over foreign defendant Techtronic Industries Co. Ltd. The first argument is, under the current formulation of the complaint, correct. And due to this flaw, the Court cannot even assess the personal jurisdiction argument concerning Techtronic Industries Co., Ltd., at this time. Accordingly, that motion is denied as moot in view of the dismissal of the "TTI" claims in their entirety. Chamberlain will have the opportunity to replead as to the TTI defendants. In doing so, it should consider carefully not only the "group pleading" problem detailed below but also the arguments advanced by TTI Co. as to the absence

4

of personal jurisdiction over that entity. As to defendant Scott, however, the complaint successfully states some claims.

**I. Group Pleading**

In its introduction, the complaint lumps together all seven corporate defendants and states it will refer to them "collectively" as "TTI." The only allegations that identify specific defendants are that Scott worked at TTI Floor Care, *see* Compl. ¶ 51, as did the recruited Chamberlain director of marketing communications, *see id.* at ¶ 57. The defendants argue that the complaint's use of "TTI" to refer to multiple entities constitutes impermissible group pleading.

A complaint must set forth what each person (or corporation) is accused of doing. *Bank of Am., N.A. v. Knight*, 725 F.3d 815, 818 (7th Cir. 2013). "A complaint based on a theory of collective responsibility must be dismissed." *Id.* The core of such a requirement is that each defendant is put on notice as to the scope of the claims against it. *Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009). "Details about who did what are not merely nice-to-have features of an otherwise-valid complaint; to pass muster under Rule 8 of the Federal Rules of Civil Procedure, a claim to relief must include such particulars." *Atkins v. Hasan*, No. 15 CV 203, 2015 WL 3862724, at *2 (N.D. Ill. June 22, 2015). Here, the complaint's allegations almost never distinguish between "the defendants" or "TTI" and appears at times purposefully vague about which corporate defendants took which actions, such as the refusal to identify (by name or employer) the high-level executives with whom Scott had relationships or the "recently discovered evidence of Scott's communications with TTI." *See, e.g.,* Compl. ¶ 51. If Chamberlain has Scott's communications, surely it can identify with which entity or entities he was corresponding.

Chamberlain argues that it intended to plead that all seven identities committed *every* action attributed to TTI in the complaint. *See* Pl.'s Resp. at 8, ECF No. 38 ("Where the Complaint refers to "TTI Defendants," it unambiguously alleges that *all* of the TTI Defendants misappropriated trade secrets and induced breach of contracts and breach of fiduciary duty.") (emphasis in original). That argument is simply implausible. Many of the allegations in the complaint simply *cannot* be true of all the TTI entities—for example, that in 2013, Scott interviewed for a position "at TTI." Compl. ¶ 3. Surely Scott did not interview for a single position affiliated with all seven companies (or, if he did, that needs to be stated clearly). Similarly, Scott is alleged to have had relationships with "at least two high-level TTI executives," *id.* at ¶ 44, and some unknown TTI entity reach out to Scott about potential employment, *id.* at ¶ 46. Scott sent hardware to "one of the TTI executives" and "provided information to TTI about his trip." *Id.* at ¶ 49. Surely Chamberlain does not mean Scott sent the information to seven different entities. Rather, the Court assumes that Chamberlain meant to imply a relationship between some or all of the entities that may have resulted in the information being shared or distributed. At this point, however, Chamberlain has not alleged any sort of relationship between the corporate defendants or why it can be plausibly inferred that information known to one was known to all.

In defense of its pleading, Chamberlain also contends that the seven corporate defendants have often acted interrelatedly, with individuals operating with multiple roles in multiple corporations and the defendants referring to themselves collectively in their answers to related litigation. *See* Pl.'s Resp. at 9. This latter argument hints, but never fully argues, that the defendants are not in fact distinct entities but are truly one organization or alter-egos of one another. To the extent that is Chamberlain's argument, Chamberlain needs to allege facts in the

complaint that would permit those conclusions to be plausibly inferred. *See, e.g., Flentye v. Kathrein*, 485 F. Supp. 2d 903, 913 (N.D. Ill. 2007) (motion to dismiss denied if complaint "fairly alleges an entity exists as the alter ego of another and provides factual manifestations suggesting the existence that the two operate as a single entity"). At present, the complaint lacks allegations that suggest that these corporate entities are really one and the same business.

At bottom, Chamberlain's theory is that the TTI defendants were all in on the scheme to develop a competing garage door opener by misappropriating, through Scott, Chamberlain's trade secrets and other confidential effort information. Though it never uses the word "conspiracy" (due, perhaps, to concern that doing so would undermine its contention that the TTI defendants were not distinct entities[2]), its gist is that the TTI defendants agreed and worked together to pull off the scheme. There is nothing inherently wrong with this theory, but the claim lacks sufficient facts to make it plausible. It is not enough to allege conspiracy, or concerted action, without differentiating between the participants. "Liability is personal. An allegation that *someone* looted a corporation does not propound a plausible contention that *a particular person* did anything wrong. . . . Although every conspirator is responsible for others' acts within the scope of the agreement, it remains essential to show that a particular defendant joined the conspiracy and knew of its scope." *Knight,* 725 F.3d at 818. At present, the complaint tells us

---

[2] *See generally Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984). In *Copperweld*, the Supreme Court held that "although a parent corporation and its wholly owned subsidiary are 'separate' for the purposes of incorporation or formal title, they are controlled by a single center of decisionmaking" and therefore "an agreement between them does not constitute a 'contract, combination ... or conspiracy' for the purposes of § 1" of the Sherman Act. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 194 (2010). Expressly pleading a conspiracy between the TTI affiliates might suggest that the affiliates should be treated as independent actors because only independent corporate entities can conspire together.

nothing about the individual actions of, or the relationships between, the various TTI defendants. Thus, the motion to dismiss is granted without prejudice as to the corporate defendants.[3]

**II. Failure to State a Claim**

The group pleading issue, however, does not eliminate the claims against Scott, whose actions are pleaded separately from those of the corporate defendants. Scott has moved to dismiss the claims against him for failure to comport with Rule 9(b) and for failure to state a claim under Rule 12(b)(6). The claims against Scott are limited to Counts One through Seven, which allege misappropriation of trade secrets, unauthorized use of a computer, breach of fiduciary duty, and breaches of various contracts.

**A. Rule 9(b)**

To state a claim for relief, a complaint must provide more than "abstract recitations of the elements of a cause of action or conclusory legal statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir.2009). Instead, "a plausible claim must include 'factual content' sufficient to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Charleston v. Bd. of Trustees of Univ. of Illinois at Chicago*, 741 F.3d 769, 772 (7th Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). But Scott argues that more is required here because Chamberlain's allegations sound in fraud. He maintains therefore that all of the claims must be dismissed for failure to comply with Rule 9(b), which requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "This ordinarily requires describing the "who, what, when, where, and how" of the fraudulent conduct, although the exact level of particularity that is required will

---

[3] Oddly, the motion also argues that it fails to state a claim as to Scott because of the group pleading of the TTI defendants. This is clearly incorrect. Scott was not lumped in collectively with the TTI defendants, so he cannot claim a lack of knowledge as to what he is alleged to have done—at least not on this basis.

necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011).

It is true, as Chamberlain points out, that the complaint does not assert a fraud claim. But "the dictates of Rule 9(b) apply to allegations of fraud, not claims of fraud." *Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust v. Walgreen Co.,* 631 F.3d 436, 446 (7th Cir. 2011). "[T]he word "fraud" need not appear in the complaint in order to trigger Rule 9(b)." *Kennedy v. Venrock Assocs.*, 348 F.3d 584, 594 (7th Cir. 2003). "A claim that 'sounds in fraud'—in other words, one that is premised upon a course of fraudulent conduct—can implicate Rule 9(b)'s heightened pleading requirements" even if a claim of fraud is not asserted. *Borsellino v. Goldman Sachs Grp., Inc.*, 477 F.3d 502, 507 (7th Cir.2007).

It is also true that, "[i]n the absence of underlying fraud allegations, claims for breach of fiduciary duties are generally not subjected to heightened 9(b) requirements." *Carlson v. Northrop Grumman Corp.*, 196 F. Supp. 3d 830, 837 (N.D. Ill. 2016). Similarly, courts generally do not treat misappropriations of trade secrets, standing alone, as allegations of fraud subject to Rule 9(b). *See, e.g., ACT II Jewelry, LLC v. Wooten,* No. 15 C 6950, 2016 WL 3671451, at *10 (N.D. Ill. July 11, 2016) (assessing ITSA and breach of fiduciary duty claims under Rule 8). But that does not, of course, mean that such claims can never be deemed to "sound in fraud." Plainly, where the facts alleged describe a course of conduct the nature of which is fraudulent, Rule 9(b)'s heightened pleading standard applies without regard to whether the legal theory itself is deemed to be a species of fraud or requires proof of fraud. *See, e.g., Borsellino*, 477 F.3d at 507 ("Although claims of interference with economic advantage, interference with fiduciary relationship, and civil conspiracy are not by definition fraudulent torts . . . whether the rule applies will depend on the plaintiffs' factual allegations."); *Venrock*, 348 F.3d 584, 593 (7th Cir.

9

2003) ("if, while the statute or common law doctrine doesn't require proof of fraud, only a fraudulent violation is charged, failure to comply with Rule 9(b) requires dismissal of the entire charge"); *Krys v. Pigott*, 749 F.3d 117, 129 (2d Cir. 2014) ("In asserting claims of fraud—including claims for aiding and abetting fraud or a breach of fiduciary duty that involves fraud—a complaint is required to plead the circumstances that allegedly constitute fraud 'with particularity.'").

So, does the complaint contain allegations of fraudulent conduct? The Seventh Circuit has acknowledged that fraud defies an exact definition. "No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated." *McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (citation and quotation marks omitted). And here, as noted above, the gist of the allegations in the complaint is that Scott (and the TTI defendants) schemed to misappropriate Chamberlain's trade secrets and proprietary information to facilitate TTI's effort to develop a GDO to compete with Chamberlain. The complaint is replete with allegations that Scott acted in a manner calculated to deceive Chamberlain about his true intentions. Scott notes many of them in his brief (at 8):

- "*Scott planned* to leave CGI long before his actual departure," "*was in communication with TTI* over the course of the year before he departed[,] and used his unique access to CGI's Trade Secrets and confidential information to misappropriate that information and *provide to TTI*," (Dkt. 1 ¶ 43);

- "the TTI executives turned to their friend, Scott, an executive at the GDO market leader for assistance," (*Id.* ¶ 46);

- "Scott was *actively planning* to compete with CGI while still employed by CGI, using his position to collect CGI's Trade Secrets and confidential information for his and TTI's benefit," (*Id.* ¶ 48) (emphasis added);

- "Scott told CGI that he would be working in TTI's Floor Care subsidiary, but *did not inform* CGI that TTI was planning to develop a GDO," (*Id.* ¶ 51) (emphasis added);

- "Scott's communications with TTI and misappropriation of CGI Trade Secrets . . . continued even after he announced his imminent resignation and departure for TTI," (*Id.* ¶ 51);

- "in the week before he left CGI, *TTI arranged for Scott to communicate*, and Scott did communicate, *on behalf of* TTI with one of CGI's key customers" (*Id.* ¶ 53) (emphasis added); and

- "Scott was *actively planning to, and TTI was inducing him to*, compete with CGI while still employed at CGI, including *by stealing* CGI's Trade Secrets and confidential information for the benefit of *TTI*." (*Id.* ¶ 54) (emphasis added).

In response, Chamberlain downplays the character of these allegations by describing them as allegations "that Scott 'communicated' with TTI or CGI customers or 'planned' to compete with CGI and take CGI trade secrets." That is not a fair description of the tale these allegations purport to tell. The picture these allegations paint is that toward the end of his tenure with Chamberlain, Scott was a rogue agent looking for opportunities to exploit his access to Chamberlain's proprietary information for TTI's benefit. The fact that Scott may not have made express misrepresentations to Chamberlain about his conduct does not mitigate the fraudulent character of the alleged scheme; fraud can be predicated on misleading omissions as well. *Pirelli Armstrong,* 631 F.3d at 447. Certainly had Chamberlain known that Scott was (allegedly) acting as an agent for a potential competitor seeking to develop a competing GDO, and suppression of Scott's alleged plan to exploit his access to Chamberlain's secrets and use them to launch that competitive endeavor, suffices to allege fraudulent conduct.

All that said, the practical import of this dispute about pleading standards is minimal. Because the complaint does not set forth claims of fraud (that is, claims that depend upon proof of fraudulent conduct), the fact that an allegation fails to satisfy Rule 9(b)'s particularity

requirements warrants only excising deficient averments of fraud from the complaint rather than dismissal of a theory that might be viable even in the absence of fraud; it "does not necessarily sound a death knell" for the complaint. *Siegel v. Shell Oil Co.*, 480 F. Supp. 2d 1034, 1040 (N.D. Ill. 2007). Accordingly, the Court evaluates Scott's contentions concerning each of the liability theories the complaint advances against him, considering allegations of fraudulent conduct only if they are necessary to the validity of the claim in light of the other allegations and then only if they pass muster under Rule 9(b). As it turns out, these claims do not turn on allegations of fraud, so the question of whether Chamberlain's allegations of fraud are pleaded with sufficient particularity is largely irrelevant.

### B. Trade Secrets Claims

Scott claims that Chamberlain has not pled a violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1832, or the Illinois Trade Secrets Act ("ITSA"), 765 ILCS 1065/1 *et seq*. Scott argues that the complaint fails to allege sufficient information to indicate what trade secrets were misappropriated or that they were secret. Information is secret under the ITSA if it meets two conditions: "(1) the information must actually be sufficiently secret and of a nature that its secrecy provides economic value; and (2) the company must take steps to preserve its secrecy commensurate with the value derived from its secret nature." *Fleetwood Packaging v. Hein*, No. 14 C 9670, 2014 WL 7146439, at *3 (N.D. Ill. Dec. 15, 2014) (*citing* 765 ILCS 1065/2). Under the DTSA, a trade secret is sufficiently secret if "the owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

Both requirements have been sufficiently alleged here, even if allegations of fraud are ignored. To begin, Chamberlain has adequately described the trade secrets that Scott allegedly misappropriated. In addition to providing a detailed listing of Chamberlain's alleged trade secrets, and describing Scott's access to that information, the complaint provides a number of specific allegations about Scott's provision of highly confidential and proprietary information to TTI while still on the job at Chamberlain. Scott is alleged to have divulged "proprietary and confidential CGI manufacturing processes" in March 2014 (¶ 49) and to have taken "a confidential CGI document related to CGI's customer strategy" and "a highly confidential summary of CGI's sales, profits, and other financial data" in connection with a meeting with someone from TTI in mid-September 2014 (¶ 50). The complaint further alleges that, shortly before he left the company, Scott misappropriated highly confidential "financial data, customer research and data, and future plans for residential GDOs" (¶ 52). And to the extent that the defendants complain that the specific documents and information have not been identified more definitively, Chamberlain cannot be faulted for failing to describe the details of that information given that the entire point of this case is they would like to keep it secret. *ACT II Jewelry*, 2016 WL 3671451 at *10.

As for its efforts to preserve the confidentiality of its proprietary information, Chamberlain has alleged in the complaint that it has taken a variety of steps to ensure the confidentiality of its information, including requiring high level employees like Scott to sign confidentiality, non-compete, and non-solicitation agreements (such as the ones at issue in this case), providing reminders to employees to return all Chamberlain property before they leave, distributing information on a need-to-know basis, using confidentiality labels, security access cards, and other measures. *See* Compl. ¶ 28. These measures are also born out in the narrative of

the complaint, in which Scott signed several such agreements and had to make a request in order to be able to visit a supplier and observe the manufacturing process. *See, e.g., id.* at ¶ 49. Those allegations plausibly suggest that Chamberlain took reasonable measures to keep their information secret.

Chamberlain has also adequately alleged that its secrecy provides it with value. Chamberlain repeatedly alleges that it secured its position as market leader through investment in new product development and customer research. *See* Compl. ¶ 24. Chamberlain has also alleged that TTI's efforts to enter the GDO market were unsuccessful because they lacked the "design, marketing, and financial know-how to compete" in the market. *Id.* at ¶ 45. These allegations suffice to plead value from secrecy. *Fleetwood Packaging*, relied on by the defendants, provides a useful contrast. There, the defendants submitted affidavits for a temporary restraining order indicating that customer identities were "readily available in a public directory" and known in the industry, which rendered the information not economically valuable. *Fleetwood Packaging,* 2014 WL 7146439, at *4. The plaintiff there also did not encrypt the information or have physical security measures. *Id*. Here, Chamberlain has alleged the information is critical to its success and detailed legal, physical, and electronic security measures. Those allegations suffice to allege the information is sufficiently secret to warrant protection under the statutes.

Scott next faults Chamberlain for failing to explain how any trade secrets Scott acquired led to TTI possessing that information. This claim badly misreads the complaint, which clearly states that (among other interactions), Scott met with TTI the day after taking confidential customer strategy documents, *see id.* at ¶ 50, and that Scott disclosed information he knew about garage door opener design and marketing to TTI once he was working there, *see id.* at ¶ 70. These allegations do not depend on allegations about the more pervasive scheme to deceive

14

Chamberlain about his intentions that Chamberlain alleges and are consistent with the type of allegations made in the mine run of trade secret cases. These are not allegations that Scott deceived Chamberlain; they are allegations that he abused his legitimate access. As such, they are sufficient at the pleading stage to plausibly allege that Scott misappropriated trade secrets.

### C. Computer Fraud and Abuse Act Claim

Scott next attacks Chamberlain's claim under 18 U.S.C. § 1030, the Computer Fraud and Abuse Act ("CFAA"). First, Scott urges that a breach of fiduciary duty does not suffice as evidence that Scott exceeded his authorization to access Chamberlain's computer system. That argument is contrary to the Seventh Circuit's holding in *Int'l Airport Ctrs., L.L.C. v. Citrin,* 440 F.3d 418, 420-21 (7th Cir. 2006), where the Seventh Circuit concluded that a breach of fiduciary duty serves to terminate otherwise authorized access to a computer and gives rise to a claim under the CFAA. Remarkably, Scott urges this Court to disregard *Citrin* and dismiss the CFAA claim based on contrary precedent from the Second Circuit. *See* Def's Mem. at 16-17 (acknowledging *Citrin*'s holding but arguing that this Court should follow the Second Circuit's contrary holding in another case that featured a "thoughtful discussion" of the issue).

This Court, of course, is not permitted to disregard or depart from binding circuit precedent—even if it encounters a thoughtful contrary view from another Circuit—and Scott's suggestion that it do so is frivolous. Based on *Citrin*, the facts alleged give rise to a plausible CFAA claim: The Court understands the reference in the complaint to Scott removing highly confidential documents from his work computer, Compl. ¶ 79, to be a reference to the customer strategy and financial documents discussed in ¶ 50. As such, the complaint adequately alleges that Scott accessed confidential information on his work computer in order to provide that

15

information to TTI at an in-person meeting in mid-September in breach of his fiduciary duties and thereby rendering his access unauthorized.

Next, Scott contends Chamberlain has failed to adequately allege a loss from his actions. The term "loss" is defined in the CFAA as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Scott points the Court to *First Mortgage Corp. v. Baser*, which found that a loss of business or goodwill would be actionable only if it was "a result of the impairment or unavailability of data on the computer." *First Mortg. Corp. v. Baser*, No. 07 C 6735, 2008 WL 4534124, at *3 (N.D. Ill. Apr. 30, 2008). While that may be how to determine loss of business or goodwill, Chamberlain has alleged that it incurred "more than $5,000 in costs" as a result of "identifying and ascertaining the extent of Scott's unauthorized access to and acquisition" of Chamberlain's information. Compl. ¶ 81. This sort of loss is clearly contemplated by the statute as a loss incurred in "responding to an offense" and "conducting a damage assessment" regardless of whether service was interrupted. *See Farmers Ins. Exch. v. Auto Club Grp.*, 823 F. Supp. 2d 847, 854 (N.D. Ill. 2011). The language of the section itself clearly separates the costs of the offense from the consequential damages due to service interruptions. To read a service interruption as a requirement for incurring any loss makes no sense on either a statutory or a linguistic basis. Thus, the motion to dismiss is denied as to Scott on the CFAA claim.

### D. Breach of Fiduciary Duty

Next, Scott argues that Chamberlain has failed to explain how he breached his fiduciary duty, that it suffered damages, or that any breach caused those damages. As to the first point,

16

Scott argues that any breach of fiduciary duty claim is preempted by the ITSA. It is true that an ITSA claim is the sole remedy for the misappropriation of trade secrets. *Spitz v. Proven Winners N. Am., LLC*, 759 F.3d 724, 733 (7th Cir. 2014); *but see Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 405 (7th Cir. 2005). As Scott acknowledges, however, the complaint also alleges that he solicited business from a Chamberlain customer on behalf of TTI. *See* Def.'s Mem. at 20. That claim is not necessarily a claim regarding the misappropriation of trade secrets, and thus would not be preempted by the ITSA.

That said, the Court agrees with Scott that the complaint provides insufficient detail about the alleged solicitation. The complaint does not name the customer (only that it was a "one of [Chamberlain's] key customers"), nor does it even allege that there was a "solicitation"—that is, an attempt to obtain the customer's business. All the complaint alleges, on information and belief, is that there was some sort of "communication" with the customer. It is arguable whether the putative solicitation implicates the allegations concerning the fraudulent scheme, but resolution of that question does not matter because even under the Rule 8 pleading standards, that allegations about this episode are insufficient to plausibly allege an improper solicitation.

Further, Scott argues and the Court agrees that Chamberlain has failed to show that this particular breach proximately caused any particular loss. "Illinois courts require a plaintiff asserting [a breach of fiduciary duty claim] to show (1) the existence of a fiduciary duty, (2) a breach of that duty, and (3) an injury resulting from the breach." *Petri v. Gatlin*, 997 F. Supp. 956, 977 (N.D. Ill. 1997). While it is true that soliciting a single customer can lead to harm, the cases cited by Chamberlain involve actual lost business. *See Smith-Shrader Co. v. Smith,* 483 N.E.2d 283, 288 (Ill. App. Ct. 1985) ("as attested to by the drastic drop in gross commissions earned by S-S for the fiscal year following Smith's resignation and the concomitant departure of

key accounts, Smith's exploitation severely hindered S-S's ability to continue the business for which it was developed"); *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003) ("Leacy conspired with Barry to present Empire with a business plan to create an Empire-owned entity that would provide the same services as were already being provided by Foodcomm, and directly compete with Foodcomm" leading to a complete loss of the Empire relationship). Here, even assuming that the communication at issue was a "solicitation," there are no allegations that Scott's solicitation of the Chamberlain customer led to any loss of business by Chamberlain; for all we know, the solicitation was entirely unsuccessful. If the breach did not impact the customer's relationship with Chamberlain, it is hard to see any harm stemming from this breach. Thus, the Court grants the motion to dismiss the breach of fiduciary duty claim against Scott without prejudice.

### E. Breach of the Employment Agreements

Finally, Scott objects to the claims that he breached the non-solicitation, non-competition, and confidentiality agreements. As to the non-solicitation provision, Scott briefly argues that the complaint provides insufficient facts as to how he solicited the two employees discussed in the complaint. This argument falls flat. Scott's acts following his departure from Chamberlain do not implicate the allegations of fraudulent conduct while he was still employed at Chamberlain, so these allegations need satisfy only the standards of Rule 8, and they do. The descriptions of the employees and times the solicitations occurred should be sufficient for Scott to answer the complaint. Scott also argues that Chamberlain has failed to allege any damages stemming from the loss of their employees. This is clearly incorrect. The complaint alleges that two employees who had significant responsibilities left Chamberlain and went to work for a competitor. It is a plausible inference that the loss of their experience and the costs required to recruit replacements

(not to mention losses incurred by their knowledge moving to a competitor) harmed Chamberlain. *See, e.g., Allison v. CRC Ins. Servs., Inc.,* No. 10 C 3313, 2010 WL 2523208, at *6–7 (N.D. Ill. June 21, 2010) (loss of employees to competitor produces several injuries, including replacement costs and loss of information to competitor).

As for the claim that Scott breached the non-compete agreement, that agreement provides in relevant part that, for a one-year period after leaving Chamberlain, Scott would not "serve as director, officer, employee, stockholder, owner, consultant or independent contractor to or with any firm, person, or business entity that competes against the Company." Compl. Ex. A ¶ 1. Scott argues that he did not in fact violate the non-competition agreement because he worked for TTI Floor Care, which was not the unit that developed the competing garage door opener. In responding that the complaint alleges that Scott worked "*at TTI* . . . on issues related to GDOs," Resp. at 26 (emphasis added), Chamberlain misses the mark in two ways. First, it again lumps all of the defendants together in an assumption, unsupported by fact allegations, that all were involved in the development of the competing garage door opener; the deficiencies in that approach have already been discussed above. Second, granting that the clear implication of the complaint is that Scott provided his knowledge and expertise to the garage door opener project to *some* TTI affiliate when he left Chamberlain, that is not what the non-compete agreement prohibits. The agreement bars Scott from "serv[ing] as" a director, officer, employee or contractor for a competing entity and there are no allegations that he did so. That Scott misappropriated confidential information and turned it over to a company bent on becoming a competitor might make him liable to Chamberlain under several other legal theories, but it would not constitute "service" with an entity competing with Chamberlain. In short, the non-compete, as written, precludes working for a competitor, not providing information to a would-be

competitor. The complaint therefore fails to state a claim for breach of the non-compete agreement.

Finally, Scott argues again that Chamberlain has failed to allege in sufficient detail what information he disclosed or how. Again, this misstates the complaint, which names a variety of types of reports that Scott accessed and information he gleaned on a supplier visit as discussed above. Requiring Chamberlain to explain how Scott revealed that information without the benefit of discovery would require a higher burden than one "commensurate with the amount of information available to" Chamberlain. *Bausch v. Stryker Corp.*, 630 F.3d 546, 561 (7th Cir. 2010). Again, Chamberlain must only plead a story that makes sense, not a factually detailed one. The story of Scott's disclosure of various consumer market and design information clears that threshold (though not by much). Scott also reprises his argument regarding damages, which fails for the same reasons it fails for the non-competition agreement. Thus, the motion to dismiss the claims relating to Scott's breach of the employment agreement is also denied.

\*   \*   \*

For the reasons discussed above, the motion to dismiss is granted without prejudice with regard to the corporate defendants. The Rule 12(b)(2) motion of defendant Techtronic Industries Co., Ltd., is denied without prejudice as moot in light of the dismissal of the claims against all of the "TTI" defendants. The motion to dismiss is denied as to Scott on all counts other than Count Four (breach of fiduciary duty) and Count Six (breach of the non-compete agreement); those counts are dismissed without prejudice.

Date: September 26, 2017

John J. Tharp, Jr.
United States District Judge

20